2026 IL App (1st) 231421-U

No. 1-23-1421

Order filed April 16, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 12779 |
| | ) | |
| MATARIMO HOUPE, | ) | Honorable |
| | ) | John F. Lyke Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for first degree murder over her claims of insufficient evidence and ineffective assistance of counsel.

¶ 2    Following a bench trial, defendant Matarimo "Gina" Houpe was found guilty of first degree murder and sentenced to 20 years in prison. Defendant appeals, arguing the State failed to prove she had the requisite intent to kill and that her trial counsel rendered ineffective assistance by failing to argue for involuntary manslaughter. We affirm.

¶ 3     In 2019, defendant was charged by indictment with three counts of first degree murder for intentionally or knowingly shooting and killing Andrew Owens (counts I-III) (720 ILCS 5/9-1(a)(1) (West 2018)), and three additional counts of first degree murder for shooting Andrew, knowing such act created a strong probability of death or great bodily harm (counts IV-VI) (720 ILCS 5/9-1(a)(2) (West 2018)). (Because Andrew and a witness, Rachel Owens, have the same last name, we refer to them by their first names.) Before trial, the State nol-prossed counts II, III, V, and VI and amended counts I and IV to "strike the while armed with a firearm language."

¶ 4     At defendant's 2022 trial, Rachel Owens testified that she was Andrew's cousin and had grown up with defendant. Around 8:30 p.m. on August 14, 2019, Rachel and Andrew were attending a repast at Rachel's sister's home on the 6100 block of South Indiana Avenue in Chicago. Over 200 people were gathered in and around the residence. Rachel received a phone call regarding a fight outside. Rachel and Andrew went outside and saw a group of people—including defendant's 18-year-old son, Trevonte Starks—drag defendant across the street and hold her against a vehicle. Defendant's ex-boyfriend and Trevonte's father, Eddie Starks, was across the street. Rachel and Andrew joined the group, and Andrew and Trevonte tried to persuade defendant to stop fighting and "leave it alone." Defendant tried to get away as the group physically restrained her.

¶ 5     Defendant's sister, Shaquita "Mickey" Cottingham, walked to the back of the crowd with a pink handgun and said, "I got it on me," then withdrew as police vehicles drove down the block. As Trevonte held defendant against a gate, Trevonte had either an asthma or a panic attack and gasped for air. The group walked Trevonte to his vehicle. Defendant initially went with them, but then walked down the street toward a vehicle that Starks was sitting in. Rachel and Andrew

followed her, and Rachel heard defendant say, "Mickey, hand me my s***." Rachel walked backwards across the street, knowing defendant was asking for a firearm. Mickey handed defendant the pink handgun.

¶ 6 At that time, the vehicle containing Starks drove east on 61st Street and turned north onto Indiana. Andrew remained standing on the northwest corner of 61st and Indiana. While Andrew stood directly between defendant and the departing vehicle, defendant fired two shots toward the vehicle. Defendant raised her arm for the first shot, lowered her arm, then raised it again to fire the second shot, which struck Andrew's eye. Andrew fell to the ground, and police and medical personnel arrived within minutes. About 15 minutes passed from the time Rachel received the phone call about the fight until defendant fired the shots.

¶ 7 Chicago police officer Musa Ahmad testified that at approximately 8:40 p.m. on August 14, 2019, he and his partner responded to a reported shooting on the 6100 block of South Indiana. On arrival, Ahmad exited his vehicle and observed a "chaotic" and "loud" scene with 50 to 100 people. A person later identified as Andrew was lying on the street near the curb surrounded by 10 to 15 people. One person directed Ahmad to a pink, semiautomatic pistol beside a light post. The firearm was loaded with one round in the chamber and six rounds in the magazine. Defendant approached another officer and admitted to the shooting, and Ahmad arrested her.

¶ 8 Chicago police officer Cara Costello, who responded to the scene at 9:40 p.m., testified that she observed two fired cartridge cases on the south side of 61st and "a considerable blood pool" on the north side.

¶ 9 Chicago police detective Darren Dehaan testified that after the shooting, Andrew was transported to a hospital, where he died. Dr. Ponni Arunkumar, chief medical examiner at the Cook

County Medical Examiner's Officer, testified that an autopsy revealed Andrew's cause of death was the gunshot wound to his head.

¶ 10    Forensic scientist Marc Pomerance testified that the pink handgun was a double action, semiautomatic firearm that required a longer trigger pull than a single action firearm. It had a thumb safety, such that someone firing must disengage the safety, rack the slide, and pull the trigger twice to fire two shots. The cartridge cases and a projectile fragment recovered from Andrew's head were fired from the pink handgun.

¶ 11    Defendant testified that on August 14, 2019, she was living in Springfield, Illinois but came to Chicago with Trevonte to attend a funeral. After the funeral, they attended the repast, where defendant spoke to her ex-boyfriend, Starks, for the first time in four months. Defendant explained that she still loved Starks and wanted him to be part of their family, but "it didn't happen" because Starks was selling drugs and "didn't want to change." At the repast, defendant and Starks "started arguing." Starks grabbed defendant's hair "as if he was trying to slam" her and ripped out some of her braids. Defendant "was swinging and defending" herself. Other people stopped the fight and took defendant across the street. Defendant was "hurt" and "embarrassed," and her emotions were "just all over the place." She yelled for those restraining her to let her go because she "needed to say what [she] had to say."

¶ 12    Trevonte started having difficulty breathing, and people took him to sit in his vehicle. When defendant saw that Trevonte could not breathe, she "got so mad" and walked back toward Starks, who "jumped" in a vehicle that drove east on 61st. Defendant "started screaming" and yelled for her sister Mickey to "give me my s***," referring to the pink handgun. Defendant

disengaged the safety and fired twice toward the vehicle Starks was riding in. She fired "out of frustration" and "wasn't aiming at anything." She did not intend to shoot Andrew.

¶ 13    On cross-examination, defendant admitted she "lied" to police that she "was trying to shoot at the tire" of Starks's vehicle, but the vehicle "was already gone." She repeated that she "wasn't aiming at anything" but was "firing towards the area of the car."

¶ 14    In closing, the State argued, "This was a murder case; nothing less, nothing more." The prosecutor emphasized that it was undisputed defendant pulled the trigger and shot Andrew, and argued that defendant displayed the requisite intent to kill or cause great bodily harm for purposes of first degree murder. The prosecutor stated, "When you point a firearm in the direction of another person and you pull the trigger and shoot, not once, [but] twice, there can be only one intent."

¶ 15    Defense counsel argued that defendant had acted under a sudden and intense passion sparked by her history with Starks and physical altercation with him prior to the shooting. Applying this mitigating factor, counsel asked the court to find defendant guilty of only second degree murder. Counsel further contended, "what you have really is akin to a reckless discharge of a firearm," stating:

> "The law that applies to this case is that [defendant] made a reckless discharge of a firearm in a vague general direction of where her boyfriend [was] and as she stated, which is corroborated by the evidence, a shot that was borne out of frustration. That's a reckless discharge of a firearm and there's no intent here to justify a finding on first-degree murder."

¶ 16    The court found defendant guilty on both counts of first degree murder, explaining that defendant had not proved she acted under such a sudden and intense passion resulting from serious provocation as to mitigate the offense to second degree murder. The court noted that defendant

"admitted that the fight was over on multiple occasions" and there were "several intervening events" between the fight and the shooting. Nonetheless, after watching Starks leave, defendant requested her firearm. The court emphasized that the firearm "was not even ready to fire" and defendant "made a conscious decision" to disengage its safety. Further, defendant "did not fire it in the air" and "did not fire it in the ground," but "through her own mouth, said she shot it in the area of the car. Not only was a car there. [There were] people out there, lots of people out there."

¶ 17    The court denied defendant's motion to reconsider, stated the counts merged, and imposed 20 years in prison without specifying which count had merged and which count she was sentenced.

¶ 18    Defendant appeals, arguing first that she is guilty only of involuntary manslaughter because the State failed to prove she had the mental state required for first degree murder.

¶ 19    As an initial matter, we note that the trial court merged the two murder counts but did not specify which count merged into the other. When two guilty findings are based on the same conduct, the less serious offense merges into the more serious offense. *People v. Walker*, 2011 IL App (1st) 072889, ¶ 39. Here, intentional or knowing murder (count I) is more serious than "strong probability" murder (count IV). See *id.* Count IV therefore merged into count I, and only count I is final for purposes of this appeal. See *People v. Patterson*, 2022 IL App (1st) 182542, ¶ 49 (appellate court may not consider a challenge to a guilty finding on an unsentenced count).

¶ 20    When considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28; see also *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). We will not retry the defendant or substitute our judgment for that of the trier of fact regarding the weight of the evidence or the

credibility of witnesses. *Jones*, 2023 IL 127810, ¶ 28. We allow all reasonable inferences in favor of the State and will not reverse unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.*

¶ 21     Defendant argues that the State failed to prove she had the mental state required for first degree murder. Section 9-1(a)(1) of the Criminal Code of 2012 provides that a defendant commits intentional first degree murder when, in performing acts that cause the death of an individual, she "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2018). A person acts intentionally when her conscious objective or purpose is to accomplish a result or engage in conduct described by a statute defining an offense. *Id.* § 4-4.

¶ 22     A defendant commits involuntary manslaughter, by contrast, when she recklessly performs an act that is likely to cause death or great bodily harm to another. *Id.* § 9-3(a). Recklessness is the conscious disregard of a substantial and unjustifiable risk that a result will follow, constituting a gross deviation from the standard of care that a reasonable person would exercise in the situation. *Id.* § 4-6.

¶ 23     Involuntary manslaughter is a lesser-included offense of first degree murder. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 78. A defendant's mental state is what differentiates involuntary manslaughter from murder. *Id.* Mental state may be inferred from surrounding circumstances, including the character of a defendant's actions and the nature and seriousness of the victim's injuries. *People v. Lengyel*, 2015 IL App (1st) 131022, ¶ 47. Mental state is a question to be resolved by the trier of fact. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 68.

¶ 24    Under the doctrine of transferred intent, if a defendant shoots at one person with the intent to kill but kills an unintended victim, she may be convicted of first degree murder for the death of that victim. *People v. Shelton*, 293 Ill. App. 3d 747, 751 (1997). The legislature included the doctrine of transferred intent in the Criminal Code by use of the phrase "or another"; that is, a defendant is guilty of murder pursuant to section 9-1(a)(1) if she " 'intends to kill or do great bodily harm to that individual *or another*, or knows that such acts will cause death to that individual *or another*.' " (Emphasis in original.) *Id.* at 752 (quoting 720 ILCS 5/9-1(a)(1) (West 1994)); see also 720 ILCS Ann. 5/9-1, Committee Comments-1961, at 14 (Smith Hurd 1992) (" 'Or another' recognizes the established principle often described as 'transferred intent' "). In other words, if a defendant has the requisite mental state for murder, she "is criminally liable for murder just as if the unintended victim were the intended victim." *People v. Shafer*, 2020 IL App (4th) 180343, ¶ 34.

¶ 25    Here, undisputed evidence showed that, after physically fighting with Starks and resisting intervention by Andrew and others, defendant asked for and obtained her firearm, followed Starks's vehicle, disengaged the firearm's safety, and fired twice in the direction of Starks and Andrew on a public street where hundreds of people had gathered nearby. She raised and lowered her arm for each shot, with the second hitting and ultimately killing Andrew.

¶ 26    Defendant claims these acts were merely reckless. She points to her own testimony that Starks's vehicle "was already gone," or too far away to hit, in arguing that "there was no evidence that she aimed at any person." On this basis, she maintains her conscious objective in firing was not to kill or harm anyone, and "deliberately firing the gun was not alone sufficient to prove intent for murder."

¶ 27   However, the trier of fact may infer a defendant's mental state from the surrounding circumstances (*Lengyel*, 2015 IL App (1st) 131022, ¶ 47), and "[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill" (*People v. Jones*, 2021 IL App (1st) 181266, ¶ 71 (internal quotation marks omitted)). The evidence shows— and defendant admitted—that she deliberately fired a handgun twice in Starks's direction. This supports the conclusion that defendant acted with the intent to kill Starks.

¶ 28   Under the doctrine of transferred intent, it was not necessary for the State to prove defendant had a specific intent to kill *Andrew* to sustain a conviction for murder, where it presented sufficient evidence for the court to find defendant "made a conscious decision" to fire her handgun at Starks. See *id.* That decision constituted an intent to kill, even though defendant unintentionally shot Andrew instead. See *Shafer*, 2020 IL App (4th) 180343, ¶ 34. Thus, the trial court, as a rational trier of fact, properly found the elements of intentional murder beyond a reasonable doubt.

¶ 29   Next, we turn to defendant's claim that her trial counsel rendered ineffective assistance by conceding the elements of first degree murder and "focusing" on the mitigating factor of provocation for second degree murder. Defendant contends there was no objectively reasonable ground for doing so, because the argument for second degree murder was "far weaker" than for involuntary manslaughter.

¶ 30   In reviewing a claim of ineffective assistance, we apply the test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which asks (1) whether trial counsel's performance was deficient and (2) whether the deficiency prejudiced the defendant. See *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984) (adopting *Strickland*). A defendant must show that counsel's performance was "objectively unreasonable under prevailing professional norms" and that, but for the

unreasonable performance, there is a reasonable probability the result would have been different. *People v. Cherry*, 2016 IL 118728, ¶ 24. Failure to establish either prong precludes a finding of ineffective assistance. *Id*.

¶ 31    Here, defendant's trial counsel may have "focused" on provocation in closing arguments, but counsel also expressly argued defendant's actions amounted to "a reckless discharge of a firearm[,] and there's no intent here to justify a finding on first-degree murder." This is precisely the argument defendant now faults her counsel for failing to make.

¶ 32    Moreover, in a bench trial, the trial court determines from the evidence whether a defendant is guilty of the charged offense or a lesser-included offense, whether or not counsel specifically asks the court to do so. See *People v. Spiller*, 2016 IL App (1st) 133389, ¶¶ 35, 40. The court is presumed to know the law and follow it, including the law related to lesser-included and mitigated offenses, unless the record affirmatively shows otherwise. See *People v. McCauley*, 2013 IL App (4th) 110103, ¶ 118.

¶ 33    Here, the trial court found defendant made a "conscious decision" to shoot at Starks when it convicted defendant of intentional murder. We presume the court knew it could have found her guilty of the lesser-included offense of involuntary manslaughter, had the evidence supported that instead. *Id.* As such, there is no reasonable probability that the result of defendant's trial would have been different had her counsel explicitly argued involuntary manslaughter. Defendant thus cannot show she was prejudiced by her counsel's failure to do so, and her claim of ineffective assistance fails. See *Cherry*, 2016 IL 118728, ¶ 24 (failure to establish either prong precludes a finding of ineffective assistance).

¶ 34    For these reasons, we affirm the judgment of the trial court.

¶ 35    Affirmed.